BAKER v OAKWOOD HOSPITAL CORPORATION

Docket No. 206407. Submitted March 9, 1999, at Detroit. Decided January 18, 2000, at 9:00 A.M.

Veronica L. Baker brought a wrongful discharge action in the Wayne Circuit Court against Oakwood Hospital Corporation and Stephen M. Aronson, M.D., claiming breach of contract, retaliation in violation of public policy, and interference with contractual or advantageous relations in connection with her employment as research nurse coordinator for a study of the experimental drug Sabeluzole conducted by Dr. Aronson on patients with Alzheimer's disease and for a proposed, but not undertaken, study by the same doctor of the experimental drug Milanimine on Alzheimer's patients. The plaintiff moved for the compelled discovery of the histories and records of the patients in Dr. Aronson's Sabeluzole study, of documents relating to sponsorship of the Sabeluzole study by the Janssen Research Foundation and to sponsorship of the Milanimine study by Parke-Davis, of documents relating to limitations on Dr. Aronson's retention of lecture honoraria, of tax forms showing income earned by Dr. Aronson for speaking engagements and the Sabeluzole study, and of Dr. Aronson's travel records. The plaintiff argued that the medical records and research project records would support her allegations that Dr. Aronson had violated Food and Drug Administration (FDA) research rules and the research project protocol and that Dr. Aronson had required the plaintiff to practice medicine without a license and commit other improper acts. The plaintiff argued that the documents pertaining to Dr. Aronson's travel, speaking engagements, and honoraria were relevant because they related to her allegations that Dr. Aronson's travel took precedence over his participation in the study, prompting him to delegate medical responsibilities to the plaintiff and falsify records. Over the defendants' objection that the medical records were privileged and that the other documents were not relevant, the court, Pamela R. Harwood, J., granted the plaintiff's discovery motion. The defendants appealed by leave granted.

The Court of Appeals held:

1. The physician-patient privilege statute, MCL 600.2157; MSA 27A.2157, provides that a person duly authorized to practice medicine or surgery shall not disclose any information that the per-

son has acquired in attending a patient in a professional character if the information was necessary to enable the person to prescribe for the patient as a physician or to do any act for the patient as a surgeon. The statute imposes an absolute bar in that it prohibits a physician from disclosing, in the course of any action wherein the physician's patient or patients are not involved and do not consent, even the names of such noninvolved patients. In this case, the medical records of the patients in the Sabeluzole study are protected by the physician-patient privilege and are not subject to discovery. The trial court abused its discretion in compelling discovery of the medical records.

2. The personal records of Dr. Aronson, with the exception of the documents relating to the Parke-Davis project on which neither the plaintiff nor Dr. Aronson worked, are relevant to the plaintiff's claims and are subject to discovery under MCR 2.302(B)(1). The trial court did not abuse its discretion in ordering discovery of those records.

Affirmed in part and reversed in part.

PHYSICIANS AND SURGEONS — PHYSICIAN-PATIENT PRIVILEGE — DISCOVERY.

The physician-patient privilege bars a physician, in the course of any action wherein the physician's patient is not involved and has not waived the privilege, from disclosing the medical records of the patient (MCL 600.2157; MSA 27A.2157).

*David D. Kohl*, for the plaintiff.

*Dykema Gossett PLLC* (by *Rosemary G. Schikora*), for the defendants.

Before: SAWYER, P.J., and FITZGERALD and SAAD, JJ.

SAAD, J. Defendants Oakwood Hospital Corporation and Stephen M. Aronson appeal by leave granted the September 3, 1997, order by Wayne Co Circuit Judge Pamela R. Harwood granting plaintiff Veronica L. Baker's motion to compel production of patient medical records and certain of defendant Aronson's personal records in a wrongful discharge lawsuit. This Court granted defendants leave to file this interlocutory appeal. We reverse the order compelling produc-

tion of the medical records, but affirm the order compelling production of Aronson's personal records.

## I. NATURE OF THE CASE

This appeal raises several discovery issues, one of which involves an issue of first impression in Michigan regarding the scope of the physician-patient privilege. Plaintiff alleges that the medical research records of Alzheimer's patients contain necessary and material information relating to her wrongful discharge lawsuit. She contends that these records will bear out her claim that defendant Aronson, a doctor, required her to practice medicine without a license by performing research functions restricted to physicians. She argues that defendants are not entitled to assert the physician-patient and psychotherapist-patient privileges in order to shield relevant evidence. Defendants argue that the privileges constitute an absolute bar to disclosure. Without reaching the issue of privilege, the trial court ordered defendants to produce the records in redacted form. Defendants took an interlocutory appeal from that order.

We conclude that under Michigan Supreme Court precedent and subsequent decisions by this Court, the physician-patient privilege is an absolute bar that prohibits the unauthorized disclosure of patient medical records, including when the patients are not parties to the action. We reverse the trial court's order compelling discovery of those records.

## II. FACTS AND PROCEEDINGS

This lawsuit arises from an employment dispute between plaintiff, a registered nurse who worked as a research nurse coordinator, and defendant Stephen

M. Aronson, M.D. Dr. Aronson conducted a study of Sabeluzole, an experimental drug for the treatment of Alzheimer's disease under the sponsorship of the Janssen Research Foundation (JRF). He began this research at Wayne State University and the Veterans' Administration Hospital, and later brought the study to Oakwood Hospital. Plaintiff worked with Dr. Aronson at Wayne State and the VA hospital, and joined him at Oakwood in January 1996 on a less than full-time basis.

According to plaintiff, plaintiff's and Dr. Aronson's working relationship quickly deteriorated after the move to Oakwood. Plaintiff's part-time status led to a conflict between her and Dr. Aronson over plaintiff's hours, compensation, and benefits package. Plaintiff alleges that Dr. Aronson gave her false information on these matters before she made the move. The parties also disagreed over plaintiff's responsibilities. Plaintiff has alleged the following version of events: After moving to Oakwood, Dr. Aronson was permitted to retain honoraria for lectures and speaking engagements that he had not been permitted to retain at Wayne State. Induced by this financial incentive, Dr. Aronson overbooked himself with speaking engagements that interfered with his participation in the research. Because he was often out of town, he was not available to perform patient medical exams and other research-related duties. Instead, he expected plaintiff to "practice medicine without a license" by assuming certain duties that Food and Drug Administration (FDA) regulations and research protocols restricted to medical doctors. He also required plaintiff to falsify records to conceal his lack of involvement. The parties also clashed over a pending Parke-

Davis study of the drug Milanimine. This study never materialized. Dr. Aronson contests plaintiff's version of events and has denied asking her to do anything improper. Dr. Aronson avers that plaintiff's dissatisfaction stems from defendants' inability to accede to her demands regarding wages, benefits, and work schedule.

In June 1996 plaintiff left Oakwood's employ. Again, the parties dispute the circumstances of plaintiff's departure. Plaintiff alleges that she confronted Dr. Aronson over his illegal and unethical conduct, which caused him to become angry and demand her resignation. When plaintiff refused to sign a resignation letter, he falsely informed Oakwood administration that she had resigned. In contrast, defendants contend that plaintiff voluntarily quit out of dissatisfaction with her compensation and because Dr. Aronson refused her demand to be paid a "finder's fee" for each patient in the study.

Plaintiff filed this three-count lawsuit against Oakwood and Dr. Aronson. Plaintiff included counts for "wrongful discharge" (specifically, a breach of contract claim), "retaliation in violation of public policy," and "interference with contractual or advantageous relations." With respect to the second count, plaintiff alleged that defendants terminated her employment in retaliation for her objections to Dr. Aronson's illegal and unethical conduct.

#### DISCOVERY REQUESTS AND OBJECTIONS TO DISCOVERY

In the course of discovery, plaintiff requested defendants to produce "a copy of the case histories and records of the patients in Dr. Aronson's JRF Sabeluzole study." Although the discovery request

asked for patient names to be replaced by numbers to preserve confidentiality, plaintiff also requested a key showing the numbers associated with the names.

Plaintiff also requested the following: documents relating to the JRF Sabeluzole research project and the abortive Parke-Davis research project on the drug Milanimine; documents relating to limitations on Dr. Aronson's retention of lecture honoraria at both Oakwood and Wayne State; Forms 1099 for the tax years 1994-96, showing amounts paid for speaking engagements; travel records for 1994-96; and Forms 1099 for 1994-96 showing amounts JRF paid for the Sabeluzole study.

In their response to this request, defendants objected to the request for medical records because the information was not relevant and was not reasonably calculated to lead to the discovery of admissible evidence. Defendants also averred that the request was "overly broad and burdensome" because it involved thousands of pages of documents that filled two file cabinets. They objected to the requests for Forms 1099, research documents, honoraria records, and travel records on grounds of relevance.

Plaintiff filed her motion to compel discovery of these documents. She argued that the medical records and research project records were relevant because they would support her allegation that Dr. Aronson violated FDA research rules and the research project protocols, and required plaintiff to practice medicine without a license and commit other improper acts. She argued that documents pertaining to Dr. Aronson's travel, speaking engagements, and honoraria were relevant because they related to her allegations that Dr. Aronson's travel took precedence

over his participation in the study, prompting him to delegate medical responsibilities to plaintiff and falsify records.

In response, defendants reiterated their objection that the medical records were not relevant to any issue and were too burdensome to produce. Additionally, defendants argued at the motion hearing that the records were privileged, although they had not raised this matter in their brief.

With respect to the remaining discovery requests, defendants argued that the research documents were not relevant because plaintiff was not required to demonstrate that Dr. Aronson actually committed any violations to prove her retaliatory discharge claim (which defendants erroneously labeled a whistleblowers' claim[1]). Similarly, they argued that information on Dr. Aronson's travels and speaking engagements was irrelevant because plaintiff would not be required to prove that Dr. Aronson did, in fact, neglect his research responsibilities.

The trial court heard the motion on August 22, 1997, concluded that the materials were sufficiently relevant to plaintiff's causes of action for purposes of discovery, and granted the motion to compel. However, the court also issued a protective order to maintain confidentiality of the records and to replace patients' names with initials. We granted defendants' application for interlocutory appeal.

---

[1] The Whistleblowers' Protection Act, MCL 15.361 *et seq.*; MSA 17.428(1) *et seq.*, protects from retaliation employees who reported or were about to report their employers' illegal conduct to a government agency. Plaintiff has never alleged that she was prepared to report Aronson's conduct to the FDA or any other government agency, and has never sought relief under the Whistleblowers' statute.

III. ANALYSIS

A. THE PHYSICIAN-PATIENT PRIVILEGE AND DR. ARONSON'S
RESEARCH RECORDS

The applicability of the physician-patient privilege
is a legal question that this Court reviews de novo.
Once we determine whether the privilege is applica-
ble to the facts of this case, we determine whether
the trial court's order was proper or an abuse of dis-
cretion. See *Dorris v Detroit Osteopathic Hosp*, 220
Mich App 248, 250; 559 NW2d 76 (1996), aff'd 460
Mich 26; 594 NW2d 455 (1999), see also *Reed Dairy
Farm v Consumers Power Co*, 227 Mich App 614, 618;
576 NW2d 709 (1998), for the standard for reviewing
attorney-client privilege, which we consult for
analogy.

1. THE STATUTORY PRIVILEGES

The physician-patient privilege statute provides, in
pertinent part:

> Except as otherwise provided by law, a person duly
> authorized to practice medicine or surgery shall not dis-
> close *any information* that the person has acquired in
> attending a patient in a professional character, if the infor-
> mation was necessary to enable the person to prescribe for
> the patient as a physician, or to do any act for the patient
> as a surgeon. [MCL 600.2157; MSA 27A.2157 (emphasis
> added).]

The Mental Health Code, MCL 330.1001 *et seq.*;
MSA 14.800(1) *et seq.*, includes additional protection
for communication to a psychiatrist or psychologist.
The Mental Health Code defines "privileged communi-

cation" as "a communication made to a psychiatrist or psychologist in connection with the examination, diagnosis, or treatment of a patient, or to another person while the other person is participating in the examination, diagnosis, or treatment or a communication made privileged under other applicable state or federal law." MCL 330.1700(h); MSA 14.800(700)(h). The Mental Health Code provides that privileged communications "shall not be disclosed in civil, criminal, legislative, or administrative cases or proceedings, or in proceedings preliminary to such cases or proceedings, unless the patient has waived the privilege," except in six enumerated circumstances, none of which is applicable here. MCL 330.1750(1), (2); MSA 14.800(750)(1), (2). The psychiatrist-patient privilege prohibits disclosure of "the fact that the patient has been examined or treated or undergone a diagnosis" except where that information is relevant to a health care provider's or insurer's rights or liabilities. MCL 330.1750(3); MSA 14.800(750)(3). The physician privilege bars disclosure of "*any information*" acquired in the course of the professional relationship, whereas the psychiatrist privilege applies only to the *patient's communications*. However, the record in this case is insufficient for determining if the distinction is important here. Although defendants suggest that the psychiatric privilege might preclude discovery even if the physician privilege does not, we conclude that for purposes of this appeal, there is no difference in the application of these two privileges as applied to the facts here.

A threshold issue that neither party raised or addressed is whether the physician-patient privilege applies in this case, where Dr. Aronson and the

Alzheimer's patients were not involved in a traditional doctor-patient relationship. Plaintiff has not contended that the patient records from the Sabeluzole study fall outside the scope of privileged matters under either statute. Hence, we assume for purposes of our analysis that the subjects were patients entitled to the privilege.

"The purpose of the [patient-physician] privilege is to protect the doctor-patient relationship and ensure that communications between the two are confidential." *Herald Co Inc v Ann Arbor Public Schools*, 224 Mich App 266, 276; 568 NW2d 411 (1997). The privilege did not exist at common law; thus, "the statute controls the scope of the privilege in Michigan." *Id.* "The privilege belongs to the patient and can be waived only by the patient." *Id.* Plaintiff also has not contended that any of the patients expressly or impliedly waived their privilege, or that any of the six enumerated exceptions in MCL 330.1750(2); MSA 14.800(750)(2) is applicable.

### 2. DEFENDANTS' ARGUMENTS FOR APPLICATION OF PRIVILEGE

There is ample Michigan authority to support defendants' argument that the physician-patient privilege is an absolute bar that protects the medical information of nonparty patients, although no case is on all fours. Defendants rely on *Schechet v Kesten*, 372 Mich 346; 126 NW2d 718 (1964). In *Schechet*, the plaintiff, a physician, sued the defendant, a hospital administrator, for defamation, alleging that the defendant attacked his professional competence. *Id.*, 349. The plaintiff served interrogatories on the defendant that requested the defendant to identify the "cases" (presumably the names of patients and infor-

mation about their treatments) that induced the defendant to make the censorious statements. *Id.*, 350. The Michigan Supreme Court held that the physician-patient privilege barred disclosure:

> The statute imposes an absolute bar. It protects, "within the veil of privilege," whatever in order to enable the physician to prescribe, "was disclosed to any of his senses, and which in any way was brought to his knowledge for that purpose." (*Briggs v Briggs*, 20 Mich 34, 41 [1870].) Such veil of privilege is the patient's right. *It prohibits the physician from disclosing, in the course of any action wherein his patient or patients are not involved and do not consent, even the names of such noninvolved patients.* [*Id.*, 351 (emphasis added).]

Relying on *Schechet,* this Court has held that the physician-patient privilege barred disclosure of medical information for patients who were not parties to the action. In *Dorris, supra,* the plaintiff in a medical malpractice action sought the name of the patient who shared her hospital room because she believed this person would corroborate plaintiff's allegation that plaintiff refused a certain medication. 220 Mich App 249-250. This Court held that *Schechet* was binding precedent that barred disclosure of a patient's name. *Id.*, 251-252. Our Supreme Court agreed and affirmed this Court's decision:

> The language of § 2157 is clear in its prohibition of disclosure of privileged information. In accordance with prior rulings of this Court, particularly *Schechet*, that the purpose of the privilege is to encourage patients' complete disclosure of all symptoms and conditions by protecting the confidential relationship between physician and patient, we find requiring the defendant hospitals to disclose the identity of unknown patients would be in direct contradiction of

the language and established purpose of the statute. [460
Mich 37.]

Similarly, in *Popp v Crittenton Hosp*, 181 Mich App
662; 449 NW2d 678 (1989), a medical malpractice
patient alleged that the defendants, a hospital and a
physician, were negligent in failing to promptly con-
duct a computerized axial tomography (CAT) scan
when the plaintiff came to the emergency room. The
physician testified that another patient was under the
CAT scan when the plaintiff arrived. The plaintiff
sought discovery of the other patient's medical
records to determine which patient deserved priority.
The trial court denied the request. *Id.*, 665. Citing
*Schechet*, this Court upheld the trial court's decision
because the physician-patient privilege is an "absolute
bar prohibiting the disclosure of even the names of
patients who are not involved in the litigation." *Id.*
This Court stated that "the information sought was
protected by a physician-patient privilege held by
someone not a party to the lawsuit who did not waive
his privilege." *Id.*

In *Dierickx v Cottage Hosp Corp*, 152 Mich App
162; 393 NW2d 564 (1986), the plaintiffs claimed in a
medical malpractice action that their first-born daugh-
ter suffered central nervous system damage as a
result of the defendants' negligence during childbirth.
*Id.*, 164-165. The defendants sought discovery of the
medical records of the plaintiffs' two younger chil-
dren because the youngest suffered from the same
developmental problems as the eldest child. The
defendants intended to show that the first-born
daughter's problems were caused by a genetic disor-
der rather than negligence. *Id.*, 165. The trial court
denied this discovery on the basis of the physician-

patient privilege. *Id.*, 166. This Court affirmed, rejecting the defendants' argument that the plaintiffs waived the privilege by placing the younger girls' physical condition at issue:

> The right to assert the physician-patient privilege is personal to the patient. . . . Although Katie and Kimberly are related to plaintiffs, they are not parties to this action. The existence of a genetic defect may be an issue in this litigation, but Katie and Kimberly (or their representatives) have not placed the health of Katie and Kimberly in controversy. Thus, they have not waived the privilege. [*Id.*, 167.]

The Court rejected the defendants argument that the privilege was "not absolute where it is asserted solely to gain strategic advantage and to conceal evidence likely to establish the truth." *Id.*, 168.

### 3. PLAINTIFF'S ARGUMENTS AGAINST APPLICATION OF PRIVILEGE

a

Plaintiff contends on appeal that she seeks only nonprivileged information from the records and that she will agree to an in camera review to redact privileged information. However, this is not what plaintiff requested in discovery, and it is not what the trial court ordered. Plaintiff requested "a copy of the *case histories and records* of the patients in Dr. Aronson's JRF Sabeluzole Study" with names redacted, but with a key showing the relationship between names and numbers. The trial court ordered the production of "the documents identified in Plaintiff's Motion", with the qualification that "patient names *only* may be redacted at Defendants' option, and replaced with initials of the patients." Neither plaintiff's proposed "confidentiality order" nor the trial court's order

would serve to protect privileged materials in the records. Also, plaintiff has never specified, either in lower court filings or on appeal, precisely what non-privileged information she needs from the records that can be isolated from privileged materials, consistent with the broad scope of the physician-patient privilege. It is therefore not possible, on this record, to fashion an order for in camera review and redaction, notwithstanding the question whether such an order is legally permissible.

Plaintiff relies on *Porter v Michigan Osteopathic Hosp Ass'n, Inc*, 170 Mich App 619; 428 NW2d 719 (1988). In *Porter*, the plaintiff claimed that her ward, a psychiatric patient in the defendant hospital, was raped by two other patients. In her lawsuit against the hospital, the plaintiff sought information about the suspected assailants, including nurses' notes, records of prior assaultive behavior, and records of the suspects' criminal conduct. *Id.*, 622. The trial court ordered an in camera inspection of these materials to determine whether a privilege applied. *Id.*, 623. On appeal, this Court noted that the materials the plaintiff requested might or might not contain privileged matters. *Id.*, 623-624 This Court approved of the trial court's utilization of in camera review to make the necessary distinction:

> As the order stands, since it excepts privileged information from disclosure and since it provides for an in camera hearing over contested information regarding whether or not it is privileged, we find that the order of the trial court sufficiently protects privileged information from disclosure while at the same time ensuring plaintiff liberal discovery. . . . We don't know where the disclosure will lead, perhaps nowhere, but the trial judge can amply protect privi-

leged information in the in camera proceeding. [*Id.*, 624-625.]

In dissent, Judge MACKENZIE argued that the majority's opinion took an unjustifiably narrow reading of the psychiatrist-patient privilege and ran contrary to *Schechet, supra. Id.*, 626-627. *Porter* no longer has any force of law. In *Dorris, supra,* the Supreme Court overruled *Porter* and held that Judge MACKENZIE's dissent was the correct statement of law. *Id.*, 36-37.[2]

Plaintiff has thus failed to cite valid authority for her argument that the physician-patient privilege is not violated where patient names have been redacted from the records. The statute does not make an exception for redacted medical records. On the contrary, the statute broadly and clearly forbids physicians from disclosing "any information" acquired under the requisite circumstances. When statutory language is clear and unambiguous, we must honor the legislative intent as clearly indicated in that language. *Western Michigan Univ Bd of Control v Michigan*, 455 Mich 531, 538; 565 NW2d 828 (1997). No further construction is required or permitted. *Id.* Read literally, the privilege statute does not allow for an exception when the information is disclosed without the patient's name attached. We therefore conclude that the privilege applies even where the patient names are not disclosed.

---

[2] In any event, *Porter* is inapplicable here because there has been no in camera review to redact privileged materials. Here, plaintiff has broadly requested entire records and case histories, without offering a basis for selecting only specific, nonprivileged information. Consequently, this Court would be unable to order the type of in camera inspection used in *Porter* that would serve plaintiff's needs to the extent permitted by the privilege. Also, because it was decided before November 1, 1990, *Porter* is not a case this Court must follow. MCR 7.215(H)(1).

b

Plaintiff also argues that the Michigan Supreme Court cases of *Domako v Rowe*, 438 Mich 347; 475 NW2d 30 (1991), and *Howe v Detroit Free Press, Inc*, 440 Mich 203; 487 NW2d 374 (1992), militate against a party invoking a privilege "for an ulterior purpose of shielding the party from production of evidence which would be damaging or unfavorable to that party." However, neither case supports plaintiff's position.

In *Howe*, the defendant newspaper published an article that portrayed the plaintiff as a severely dysfunctional alcoholic. *Id.*, 206-207. In the ensuing defamation action, defendants sought discovery of a probation report prepared in connection with the plaintiff's drunk driving conviction. *Id.*, 207. The plaintiff asserted a privilege for probation records under MCL 791.229; MSA 28.2299. *Howe, supra*, 207. The Court rejected the defendants' "automatic waiver" argument, and held that the plaintiffs were "entitled to stand by their claim of statutory privilege and have their interests carefully weighed against those of the defendants without the threat of automatic waiver or sanctions." *Id.*, 224. After balancing these interests, the Court concluded that the "benefit gained by waiving the privilege," (i.e., the defendants' access to information that could support their truth defense) "is far greater than the injury that will inure to the probation officer-probationer relationship." *Id.*, 227.

In *Domako, supra*, the defense counsel in a medical malpractice case conducted an ex parte interview with the plaintiff's treating physician, who had repaired the damage defendant allegedly caused in a prior surgery. The treating physician told the defense

counsel that he did not believe that the defendant had been negligent. *Id.*, 350-351. The plaintiff's counsel accused the treating physician of violating the physician-patient privilege and refused to allow the defense counsel to depose him. *Id.*, 351. Eventually, the Michigan Supreme Court granted leave to appeal on the limited issue whether the ex parte interview violated the physician-patient privilege. *Id.*, 352. The Court concluded that there was no violation, because the plaintiff had already waived her privilege. *Id.*, 356-357. The Court held that the plaintiff could therefore not assert the privilege for the limited purpose of preventing the ex parte interview:

> An attempt to use the privilege to control the timing of the release of information exceeds the purpose of the privilege and begins to erode the purpose of waiver by repressing evidence. Both consequences are anathema to the open discovery policy of our state. The statute and the court rule both allow waiver, thus striking an appropriate balance between encouraging confident disclosure to one's physician and providing full access to relevant evidence should a charge of malpractice follow treatment. [*Id.*, 355.]

The Court then concluded that the ex parte interview was permissible informal discovery. *Id.*, 357-361.

Neither of these cases supports plaintiff's position that defendants may not assert the privilege because they are using the privilege "offensively" to withhold relevant materials from plaintiff. In *Domako, supra,* and *Howe, supra,* the plaintiffs were asserting *their own* privileges to prevent the defendants' access to information concerning issues that the plaintiffs' own lawsuits had put into issue. In *Howe,* the privilege was deemed waived by the nature of the plaintiff's defamation lawsuit; whereas in *Domako,* the plaintiff

was selectively asserting a privilege already waived to control the manner in which the defendant investigated the lawsuit. Neither of these situations is relevant here, where the patients have not waived their privilege and where defendants have not put any privileged matters in issue. We therefore conclude that defendants' alleged motive in asserting the privilege is inconsequential.

In sum, the plain language of the physician-patient privilege statute and the relevant case law bars release of the medical records of subjects in the Sabeluzole study. We therefore vacate the trial court's order compelling discovery.

### B. DEFENDANTS' REMAINING DISCOVERY ISSUES

Defendants contend that the trial court erred in ordering production of Dr. Aronson's personal records. We review a trial court's decision to grant or deny discovery for abuse of discretion. *Mercy Mt Clemens Corp v Auto Club Ins Ass'n*, 219 Mich App 46, 50; 555 NW2d 871 (1996).

With respect to the scope of discovery, MCR 2.302(B)(1) provides:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of another party, including the existence, description, nature, custody, condition, and location of books, documents, or other tangible things and the identity and location of persons having knowledge of a discoverable matter. It is not ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Defendants argue that the following items, which the trial court ordered them to produce, are not relevant within the meaning of this court rule.

### MATERIALS ON JRF RESEARCH PROJECT

Plaintiff avers that the JRF study documents may contain information relating to her allegation that Dr. Aronson violated FDA requirements and research protocols. This is relevant to her claim that her employment was terminated in violation of public policy when she protested these practices.[3] Accordingly, plaintiff argues, the trial court did not abuse its discretion when it ordered these documents produced.

Defendants argue that items relating to the public policy claim are not relevant, because plaintiff was a just-cause employee and therefore not allowed to bring a public policy claim. Defendants' argument can be summarized as follows: Michigan recognizes an implied cause of action for wrongful termination when the plaintiff is discharged for refusing to violate a law as an *exception* to the rule that employees may be terminated at will. Because the public policy cause of action is an *exception* to at-will employment, it is not available to just-cause employees. Defendants did

---

[3] Michigan courts have recognized a cause of action for discharge in violation of public policy where an employee was dismissed for the failure or refusal to violate a law in the course of employment. *Edelberg v Leco Corp*, 236 Mich App 177, 180; 599 NW2d 785 (1999); *Garavaglia v Centra, Inc*, 211 Mich App 625, 630; 536 NW2d 805 (1995). A public policy claim is sustainable only where there is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue. *Driver v Hanley (After Remand)*, 226 Mich App 558, 566; 575 NW2d 31 (1997); *Dudewicz v Norris Schmid, Inc*, 443 Mich 68, 78; 503 NW2d 645 (1993). Defendants have not argued that there is any applicable statutory prohibition that precludes plaintiff's public policy claim.

not raise this argument in the trial court, so we need not review it here. *Garavaglia, supra,* n 1.

Defendants further argue that if plaintiff were to reformulate her public policy claim into a claim under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*; MSA 17.428(1) *et seq.*, this information would still be irrelevant because WPA plaintiffs need not prove that the employer actually violated any law, regulation, or rule. Plaintiff has not, however, evinced any intent to raise a WPA claim, so we need not consider whether the documents would be relevant in this situation.

### MATERIALS ON PARKE-DAVIS RESEARCH PROJECT

The Parke-Davis documents relate to an abortive research project that neither plaintiff nor Dr. Aronson ever actually worked on. Plaintiff has not explained how these records could be relevant to her allegations that Dr. Aronson terminated her employment because she protested his mishandling of the JRF study. Accordingly, these records are not relevant and should not have been ordered produced.

### RECORDS RELATING TO DR. ARONSON'S TRAVELS AND LECTURE ENGAGEMENTS

Defendants also object to plaintiff's discovery of the following items of information, all of which purportedly relate to her allegation that Dr. Aronson's travels and speaking engagements prevented him from properly conducting the Sabeluzole study: Wayne State's and Oakwood's policy on honoraria, tax forms 1099 showing income earned from speaking

engagements and from the Sabeluzole experiment, and date books and calendars.

Plaintiff argues that this information is relevant to support her claim that Dr. Aronson's lecturing took precedence over his research, and to rebut his deposition testimony that his lecturing was neither time-consuming nor lucrative. She maintains that these records will reveal that he was lecturing on dates of patient exams and office visits, and that the honoraria from these lectures was the financial incentive for him to neglect his research responsibilities. Under these circumstances, these materials are at least marginally relevant to plaintiff's claim. We therefore conclude that the trial court did not abuse its discretion in granting plaintiff's motion to compel.

We reverse the trial court's order to the extent it orders defendants to produce patient medical records and the Parke-Davis record. We affirm the part of the order addressing the remaining discovery issues.