Diane DENEAU Plaintiff,

v.

**MANOR CARE, INC.,** an Ohio corporation; **Heartland Health Care Center,** a Michigan company, Defendants.

No. 01–CV–72032–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 30, 2002.

John W. Mason, Dean C. Robinette, Robert R. Stearns, John W. Mason Assoc., Dearborn, MI, for Plaintiff.

Karen B. Berkery, Kitch, Drutchas, Detroit, MI, Omar Weaver, Equal Employment Opportunity Commission, Detroit, MI, for Defendants.

## MEMORANDUM OPINION

HOOD, District Judge.

This matter is before the Court on Defendants Manor Care, Incorporated and Heartland Health Care Center's (collectively, "Defendants") Motion for Summary Judgment (hereinafter referred to as "Defs.' Br."), filed on March 1, 2002. Pursuant to a Stipulated Order entered by this Court, Plaintiff Diane Deneau filed a Response to Defendants' Motion for Summary Judgment (hereinafter referred to as "Pl.'s Resp. Br.") on April 1, 2002. Defendants filed their Reply on April 8, 2002. A hearing was held in this matter on May 8, 2002. For the following reasons, Defendants' Motion for Summary Judgment is **GRANTED.**

## I. FACTS

Plaintiff, a resident of City of Garden City, Michigan, filed this diversity action for wrongful discharge in violation of: (1) Michigan's Whistle Blower's Protection Act, M.C.L. § § 15.361; (2) Michigan's Public Health Code, M.C.L. § § 333.21772; and (3) Michigan public policy. *See* Compl. at ¶¶ 1–2. According to the Notice of Removal, Defendant HCR Manor Care is incorporated under the laws of the State of Delaware with its principal office in the State of Ohio. *See* Notice of Removal at ¶ 5. The Notice of Removal also states "[t]hat, contrary to Plaintiff's assertion, Heartland Health Care Center is not a 'Michigan Corporation,' as it is an assumed name for Health Care and Retirement Corporation of America, which as an Ohio corporation that is a wholly subsidiary of Manor Care, Inc." *Id.* at ¶ 6.

Plaintiff was an at-will employee of Heartland Health Care Center–Dearborn Heights from August 1998 until February 15, 2001. *See* Compl. at ¶; *see also* Defs.' Br. at 1; Defs.' Br. at 3 (citing Ex. G). Plaintiff worked in the capacity of Minimum Data Set ("MDS") Coordinator. *Id.* In her capacity as MDS Coordinator, Plaintiff was responsible for reporting the current status of the facility's patients to the State of Michigan regulatory authorities. *See* Compl. at ¶ 9.

Plaintiff alleges that, from December 2000 through the time until Plaintiff was terminated, "Defendants experienced a critical staffing shortage." *Id.* at ¶ 10. During this staffing shortage, Defendants allegedly violated the State of Michigan's mandatory minimum staffing requirements, *id.* at ¶ 11, and "Defendants continued to admit patients, without regard to Defendants' ability to provide these patients with adequate care." *Id.* at ¶ 12.

While performing the newly-added job responsibility of monitoring the nutritional stability of the new patients during the staffing shortage, Plaintiff claims that she noticed that several patients were suffering from significant weight loss. *Id.* at ¶ 13–14. Plaintiff alleges that the patients were losing "as much as five (5%) percent of their total body weight within a period of 30 days prior to Plaintiff's termination." *Id.* at ¶ 14. Plaintiff claims that she re-

ferred these patients to physicians to treat the patients' significant weight loss in February 2001. *Id.* at ¶ 15.

Plaintiff further claims that "Defendants' management instructed Plaintiff not to fill out said referrals, stating that such referrals would preclude the Defendants from being removed from its current probationary status with the State of Michigan regulatory authorities for previous violations." *Id.* at ¶ 16. Notwithstanding these admonitions, Plaintiff asserts that she did, in fact, write such doctor referrals and entered the weight loss information in the facility's database, which is subsequently submitted to the State of Michigan regulatory authorities. *Id.* at 17. Plaintiff claims that Defendants terminated Plaintiff as a result of her actions. *Id.* at ¶ 18.

Defendants refute Plaintiff's characterization of the basis for her dismissal. According to Defendants, "Plaintiff testified that she was told that she was being terminated for saying something bad about the administrator." *See* Defs.' Br. at 1 (citing Pls.' Dep. at 72, Ex. I). The Manager of Clinical Services, Cheryl Lundin, testified that she was having a conversation with Plaintiff and that the Plaintiff, in front of other staff and within the hearing of family members and residents, made derogatory comments about Leslie Shanlian, the Administrator, stating that Shanlian did not know what she was doing and that Shanilian was the reason that there was no dietician on staff. *Id.* (citing Lundin Dep. at 26, Ex. B). Lundin subsequently reported Plaintiff's comments to Shanlian "because she felt disturbed and felt that the administrator needed to take over the situation." *Id.* (citing Lundin Dep. at 24, Ex. B).

Shanlian testified that she was concerned about Plaintiff's comments because they were made while others were present and "she did not need members of the management team speaking negatively about the company or the management of the facility." *Id.* at 2 (citing Shanlian Dep. at 57, Ex. C). Shanlian testified that she was further concerned about a nurse manager "speaking negatively about the company in front of line staff and had previously warned [Plaintiff] about this behavior." *Id.* (citing Shanlian Dep. at 58–59, Ex. C). Shanlian confirmed with the Assistant Director of Nursing, Deborah Bridges, that Plaintiff had made these comments. *Id.* (citing Bridges Dep. at 63, Ex. J).

Defendants claim that Plaintiff's improper conduct resulted in Plaintiff receiving an "Employee Written Notice, Type B" for violating company rules 18 and 28. Rules 18 and 28 govern an employee's Unwillingness to Support Company Goals and Programs and Conducting Oneself Improperly in Other Situations Not Specifically Listed, respectively. *Id.* (citing Ex. D, Employee Warning Notice dated Feb. 15, 2001). Under the Employee Handbook, which listed the alleged infractions as Type B violations, Plaintiff's actions were considered "very serious," would remain active, and would be considered for progressive disciplinary purposes for two years. *Id.* Further, if a final warning for a major/Type B has been received, it can result in termination. *Id.* (citing p. 37 attached as Ex. E of Employee Handbook).

Plaintiff had received a final warning/Type B four months prior to allegedly violating Rule 18. The previous warning, which was signed by Plaintiff on October 25, 2000, was issued because of Plaintiffs failure "to support a nurse supervisor during an altercation with two employees." *Id.* The October 25 warning specifically stated that Plaintiff would be subject to termination should her behavior continue. *Id.* at 3 (citing Ex. F).

Plaintiff filed a four-count Complaint in Wayne County Circuit Court. Count I alleges violations of the Whistleblowers'

Protection Act. Count II alleges violation of Michigan Public Health Code, Part 217. Count III alleges Wrongful Discharge in violation of Michigan public policy, and Count IV alleges Wrongful Discharge in violation of Defendants' Handbook Policies. Defendants' Motion for Summary Judgment argues that no genuine issue of material fact exists as to any Count.

## II. STANDARD OF REVIEW

Rule 56(c) states that summary judgment should be entered only where "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Moreover, the court need not accept as true legal conclusions or unwarranted factual inferences. *Hoeberling*, 49 F.Supp.2d at 577.

Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## III. ANALYSIS

Plaintiff argues that Defendants' actions violated: (A) the Michigan Whistleblower's Protection Act, M.C.L. § § 15.361 *et seq.;* (B) the Michigan Public Health Code, Part 217, M.C.L. § § 333.21771(1); (C) Michigan public policy; and (D) their own Handbook policies.

### A. Michigan Whistleblower's Protection Act, M.C.L. § § 15.361 *et seq.*

Section 2 of the Whistleblowers' Protection Act ("WPA"), M.C.L. § § 15.361 *et seq.* provides in pertinent part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation promulgated pursuant to the laws of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

MCL § 15.362. A "public body" is defined as, *inter alia*, "[a] state officer, employee, agency, department, division, bureau, board, commission, council, authority, or other body in the executive branch of state government." MCL § 15.361(d).

■ Under Michigan law, a plaintiff must establish a *prima facie* case of WPA to survive summary judgment. A *prima facie* case consists of a showing that: (1) Plaintiff was engaged in protected activity as defined by the Whistleblowers' Protection Act; (2) Plaintiff was discharged; and (3) a causal connection existed between the protected activity and the discharge. *Shallal v. Catholic Soc. Serv. of Wayne County*, 455 Mich. 604, 610, 566 N.W.2d 571, 574 (1997) (citing *Terzano v. Wayne Co.*, 216 Mich.App. 522, 526, 549 N.W.2d 606 (1996)). Additionally, Plaintiff must show that Defendants received objective notice of her intent to engage in protected activity. *See Kaufman & Payton, P.C. v. Nikkila*, 200 Mich.App. 250, 257, 503 N.W.2d 728, 732 (1993) ("[A]n employer is entitled to objective notice of a report or threat to report by the whistleblower.").

■ If the plaintiff succeeds in establishing her *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse action. *Phinney v. Perlmutter*, 222 Mich.App. 513, 563, 564 N.W.2d 532, 558 (1997) (citing *Hopkins v. Midland*, 158 Mich.App. 361, 378, 404 N.W.2d 744 (1987)). If the defendant carries this burden, the plaintiff must have an opportunity to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for discrimination. *Id.* The plaintiff may meet her burden of showing pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*

It is undisputed that Plaintiff was discharged on February 15, 2001. Further, Plaintiff asserts that she reported the alleged violations of Michigan law to the regulatory authority in February of 2001, thereby potentially satisfying the proximity requirement of the Whistleblowers' law. Defendants, however, claim that Plaintiffs cannot establish that she was engaged in "protected activity." Defendants also claim that Plaintiff failed to provide actual notice of her intent to engage in protected activity as required by the Whistleblowers' Protection Act. To survive summary judgment, therefore, Plaintiff must provide facts from which one could reasonably conclude that she had been engaged in protected activity and that she gave notice to Defendants of her intent to do so. *Shallal*, 455 Mich. at 610, 566 N.W.2d at 574; *Kaufman & Payton, P.C.*, 200 Mich.App. at 257, 503 N.W.2d at 732.

■ In *Chandler v. Dowell Schlumberger, Incorporated*, the Michigan Supreme Court explained that:

The WPA, as a remedial statute, is to be liberally construed to favor the persons the Legislature intended to benefit. The Whistleblowers' Protection Act was intended to benefit those employees engaged in "protected activity" as defined by the act. The act protects those who report or are about to report violations of law, regulation, or rule to a public body. It [also] protects those requested by a public body to participate in an investigation.

456 Mich. 395, 406, 572 N.W.2d 210, 215 (1998) (citations omitted). Michigan courts have therefore interpreted the WPA to cover two types of "whistleblowers." *See Henry v. City of Detroit*, 234 Mich.App. 405, 594 N.W.2d 107 (1999).

A "Type 1 Whistleblower" is one who, on her own initiative, takes it upon herself to communicate the employer's wrongful con-

duct to a public body in an attempt to bring the, as yet hidden, violation to light to remedy the situation or harm done by the violation. *Id.* at 410, 594 N.W.2d 107. "Type 2 Whistleblowers" are those who participate in a previously initiated investigation or hearing at the behest of a public body. *Id.* If a plaintiff falls under either category, then that plaintiff is engaged in a "protected activity" for purposes of presenting a prima facie case. *Id.* Plaintiff's Complaint and Response Brief indicate that she considers herself a "Type 1 Whistleblower."

### 1. Plaintiff has Shown a Genuine Issue of Material Fact as to Whether she Engaged in a "Protected Activity"

■ An employee is engaged in protected activity under the WPA who has reported, or is about to report, a suspected violation of law to a public body. *Shallal,* 455 Mich. at 611, 566 N.W.2d at 575. A plaintiff seeking to show that she was "about to" report must show by clear and convincing evidence that the defendant had notice of such an intent. *Id.; see also* M.C.L. § § 15.363(4).

Defendants argue that Plaintiff has not engaged in "protected activity." Specifically, Defendants argue that "Plaintiff has not alleged nor has discovery revealed that she reported any violation or suspected violation of law, regulation or rule promulgated by the laws of the State of Michigan or the United States to a public body until after she was terminated." *See* Defs.' Br. at 9. Plaintiff responds that she both reported and was "about to report" a suspected violation of law to a public body prior to her termination. *See* Pl.'s Resp. Br. at 8–10.

Plaintiff asserts that she informed Defendants of Plaintiff's intent to report a "suspected violation of Michigan's law regarding nursing homes (including Public Health Code, Part 217, [MCL § 333.21772]), and basic canons of medicine regarding maintaining patient health." *Id.* at 8. Plaintiff's Complaint avers that, during Defendants' alleged staffing shortage, Defendants allegedly violated the State of Michigan's mandatory minimum staffing requirements and continued to admit patients without regard to Defendants' ability to provide these patients with adequate care. Plaintiff claims that she noticed that several patients were suffering from significant weight loss and that, notwithstanding Defendants' admonition to the contrary, she referred these patients to physicians to treat the patients' significant weight loss in February 2001. The referrals and weight loss information were subsequently submitted to the State of Michigan regulatory authorities.

Plaintiff asserts three arguments in her Brief in Response to Defendants' Motion for Summary Judgment to support her contention that she had engaged, and was about to engage, in protected activity within the meaning of the Whistleblowers' Protection Act. In particular, Plaintiff argues that:

● Just before her termination, Deneau completed physician orders (or referrals) in which she notified staff physicians to check on the reasons for a five percent (5%) weight loss in six different patients during a period of 30 days or less. Such orders should have become part of the patient records which would have been reviewed by the State of Michigan in its resurvey of the facility following a previous "G" level citation for hydration and a "D" level citation for failing to feed the patients in a timely manner.

● Just before her termination, Deneau completed her MDS data entries which are sent via the Internet to the State of Michigan. In such entries, she not-

ed a five percent (5%) weight loss in six different patients during a period of 30 days or less. Such entries would have been reviewed by the State of Michigan.

- Just after her termination, Deneau made a written complaint to the State of Michigan in which she reported the staffing shortages (as she had complained to Lundin) and the weight loss which she feared was caused by malnutrition. (See letter dated March 19, 2001, exhibit "5" attached.) Even though this letter post-dated Deneau's termination from the Defendants' employ, it is completely consistent with the concerns she and Ms. Lewandowski raised immediately **before** their employment with the Defendants was terminated. These are the same complaints that appeared within Deneau's physician referrals and MDS data entries which were prepared for submission to the State of Michigan **before** she was terminated from the Defendants' employ. It is obvious from a reading of Ms. Deneau's letter dated March 19, 2001, she was attempting to ensure the State knew of the problems in the nursing just in case her physician referrals and MDS entries did not make it to the proper State agency.

*See* Pl.'s Resp. Br. at 9.

According to Defendants, Plaintiff's Complaint merely establishes that Plaintiff, "as required by her job duties, reported weight loss via the MDS computerized reporting system for payment." *See* Defs.' Br. at 9. Defendants further assert that "Plaintiff testified that no one told Plaintiff not to make her MDS reports, that weight loss was common in a nursing home and it is routinely reported." *Id.* According to Defendants, Plaintiff did not make any reports to the state until after she was terminated and did not give objective notice of her intent to do so. *Id.*

### a. Plaintiff's First Instance of Alleged "Protected Activity."

■ Plaintiff argues that the first instance of protected activity occurred upon her completion of physician referrals wherein she notified staff physicians to check on the reasons for a five percent (5%) weight loss in six different patients during a period of 30 days or less. Plaintiff asserts that such orders should have become part of the patient records which would have been reviewed by the State of Michigan in its resurvey of the facility following a previous "G" level citation for hydration and a "D" level citation for failing to feed the patients in a timely manner.

As to this instance of alleged protected activity, Plaintiff alleges that she informed Ms. Lundin that she was writing physician referrals for nutritional issues, and that there were not adequate staff to address the issues. *See* Pl.'s Resp. Br. at 10 (citing Dep. of Cheryl Lundin at 14–15, Ex. 4). Plaintiff claims that Ms. Lundin instructed Plaintiff to refrain from completing the physician referrals "because such referrals would preclude the Defendants from being removed from its current probationary status with the State of Michigan regulatory authorities or previous violations." *See id.* at 3 (citing Dep. of Diane Deneau at 119, 137).

Defendants refute these contentions and argue that:

Plaintiff has grossly misquoted Cheryl Lundin in order to support the proposition that Defendants had notice of Plaintiff's concerns and conspired to keep Plaintiff from writing physician's orders. Looking at her testimony in full, it is easy to see that Ms. Lundin's concerns about Plaintiff's writing of physician's orders were due purely to procedure.

*See* Defs.' Reply Br. to Pl.'s Mot. for Summ. J. at 4 (hereinafter referred to as

"Defs.' Reply Br."). According to Defendants, Ms. Lundin never told Plaintiff not to write physician's orders, "but rather told her that the orders, under Heartland policy and procedure, needed to be interdisciplinary in approach and must include a dietician and all other team members." *Id.* at 4–5 (citing Dep. of Cheryl Lundin at 14–15, 25, Ex. C). Defendants further assert that Heartland was not on "probationary" status with the State of Michigan, citing to Ms. Lundin's deposition testimony wherein she stated that she knew of no such status either at the state of federal level. *Id.* at 5 (citing Dep. of Cheryl Lundin at 38, Ex. D).

As stated previously an employee is engaged in protected activity under the WPA who has reported, or is about to report, a suspected violation of law to a public body. *Shallal,* 455 Mich. at 611, 566 N.W.2d at 575. It is undisputed that Plaintiff filled out the physician referrals prior to termination. For the purposes of the instant motion, the Court is persuaded by Plaintiff's allegations that the physician referrals reveal a suspected violation of law, to wit: failure to abide by the dietary requirements of nursing home residents. It is also undisputed that the physician referrals were not sent directly to a "public body," but instead to staff physicians, and that the State would only receive the referrals indirectly after reviewing the files of the Defendants. The question, therefore, is whether submitting the physician referrals constituted a report of a suspected violation of law to "a public body."

In considering the above stated issue, the Court finds *Henry v. City of Detroit,* 234 Mich.App. 405, 594 N.W.2d 107 (1999), instructive. In *Henry,* Charles Henry ("Henry"), a former police commander, brought an action against the City of Detroit, its police chief, and deputy police chief, alleging that the plaintiff's demotion and forced retirement violated the WPA. According to the plaintiff, the event that

precipitated his demotion and subsequent retirement was the plaintiff's deposition testimony related to a case filed by a fellow officer. After the highly publicized death of Malice Green, the Detroit Police Department formed a departmental board of review whose function included overseeing the investigation of Malice Green's death and recommending whether any officers involved should be criminally charged. At trial, it was undisputed that department rules existed that defined the role and duties of the board of review, and that the defendant police chief "effectively precluded the Malice Green board of review from performing its obligations." *Id.* at 407, 594 N.W.2d 107.

The review board's inability to perform its duties resulted in some officers innocent of any wrongdoing in the death of Malice Green being falsely accused and denied important rights by the police department. One of the innocent officers subsequently filed a civil lawsuit. Henry was called to give deposition testimony in this lawsuit. In his deposition, Henry testified that the police department rules concerning the board of review were violated and the board of review was not allowed to perform its duties. Shortly thereafter, Henry was given the choice of taking an early retirement or a demotion. Henry later filed suit alleging that these options were the result of, in part, his deposition testimony.

During the trial, the defendants argued, *inter alia,* that the plaintiff had not engaged in a protected activity because his prior deposition testimony was not a report "to a public body." *Id.* at 410, 594 N.W.2d 107. Agreeing with this contention, the Michigan Court of Appeals noted that reporting violations of departmental regulations was a protected activity under the WPA. However, the court found that "[e]ven with a broad statutory construction

... [the court] failed to see how this testimony was a report to a public body." *Id.* The court's conclusion was based on the fact that the *"[p]laintiff, [himself,] took no initiative to communicate the violation to a public body, i.e., he was not an initiator."* *Id.* at 411, 594 N.W.2d 107 (emphasis added).

In the instant case, the Court finds there is a genuine issue of material fact as to whether Plaintiff's intended actions regarding the physician referrals constituted "protected activity" within the meaning of the Whistleblowers' Protection Act. Unlike in *Henry,* a broad statutory construction does lead to the conclusion that Plaintiff took "initiative" to communicate the suspected violations of law to a public body, *i.e.,* that Plaintiff was the initiator in this case.

Plaintiff alleges that the physician referrals reveal a suspected violation of law, and that the physician referrals should have become part of the patient records which would have been reviewed by the State of Michigan.[1] Importantly, Plaintiff claims that Ms. Lundin instructed Plaintiff not to fill out the physician referrals because such referrals would preclude Defendants from being removed from its current "probationary status" with the State of Michigan regulatory authorities for previous violations. Defendant had previously received a "G" level citation for hydration and a "D" level citation for failing to feed the patients in a timely manner. Viewing the fact in the light most favorable to Plaintiff, the State, upon review of Defendants' files, would likely have considered the physician referrals defiantly placed in the residents' files by Plaintiff.

While the "reporting" of the suspected violation under Plaintiff's first theory would only reach the State of Michigan indirectly, the Court concludes for the purposes of summary judgment that the facts as alleged by Plaintiff demonstrate the equivalence of a report of a suspected violation of law to a public body. In light of the remedial nature of the WPA, the Court finds that Plaintiff's actions of writing the physician referrals, despite allegedly being instructed not to so, are sufficient to establish a question of fact as to whether Plaintiff reported a suspected violation of law to a public body.

The facts as alleged in the Complaint, Plaintiff's Response Brief, and attachments demonstrate that Plaintiff has shown a triable issue of material fact as to whether she "is one who, on her own initiative, [took] it upon herself to communicate the employer's wrongful conduct to a public body in an attempt to bring the, as yet hidden, violation to light to remedy the situation or harm done by the violation." 234 Mich.App. at 412, 594 N.W.2d at 111–12. Because reasonable minds may disagree as to whether Plaintiff was the "initiator" in this case, summary judgment is inappropriate as to the first asserted instance of "protected activity."

### b. Plaintiff's Second Instance of Alleged "Protected Activity."

■ Based on the arguments set forth in the pleadings, the Court finds no genuine issue of material fact as to whether Defendants' actions regarding the second instance of alleged protected activity violated the WPA. Plaintiff claims that she completed the MDS data entries, which

---

**1.** Defendants' citation to the deposition testimony of Mr. Lundin does not adequately refute Plaintiff's allegation that Ms. Lundin instructed Plaintiff not to fill out the physician referrals. Rather, Ms. Lundin's deposition testimony supports Plaintiff's assertion that

Defendants had notice of Plaintiff's objections to the staffing shortage and presents a triable issue of material fact as to whether Ms. Lundin told Plaintiff not to refer residents to physicians.

are sent to the State of Michigan, noting a five percent (5%) weight loss in six different patients during a period of 30 days or less. *See* Pl.s' Resp. Br. at 9. Defendants concede that Plaintiff's job duties required reporting patient data to the State, but argue that they received no notice of Plaintiff's intent to report "violations of the law" to the State, because "weight loss alone is not necessarily an indication of a violation of law".

The Court is not convinced by Defendants' argument that weight loss is not necessarily a violation of law. First, the statement itself impliedly concedes that weight loss *may* be an indication of a violation of law. *See* Defs.' Reply Br. at 4. Second, Plaintiff does not allege that the weight loss was the violation of law; she alleges that the *cause* of the weight loss, *i.e.*, that poor staffing led to poor feeding practices, was the suspected violation of law. Third, the plain text of the Whistleblowers' Protection Act does not require an *actual* violation of law. Plaintiff's suspicion that Defendants' actions were violative of the law is sufficient to satisfy the Act in this case. *See* M.C.L. § 15.362 ("An employer shall not discharge ... an employee ... because the employee ... reports or is about to report, verbally or in writing ... a violation *or a suspected violation of a law or regulation*.") (emphasis added).

However, the Court is persuaded by Defendants' contention that Plaintiff did nothing more with regard to the MDS reports than what was required by her job duties. Defendants' knowledge of Plaintiff's job duties cannot be said to provide notice to Defendants that Plaintiff was about to report a suspected violation of the law. *See* Defs.' Reply Br. at 4. Unlike the situation involving the physician referrals, where Plaintiff alleges that she was instructed to refrain from performing her job duty of referring ailing residents to physicians,

Plaintiff admits that no one told her not to submit the MDS reports as required. *See* Defs.' Reply Br. at 4 (citing Dep. of Diane Deneau at 113, lines 13–25; 114, lines 1–2).

It cannot be said that Plaintiff acted as an "initiator" by submitting the MDS reports. To the contrary, the fact that Plaintiff was performing her job duties as an agent of Defendants renders her actions those of the Defendants themselves. Defendants, by requiring submission of the MDS data and not instructing Plaintiff to do otherwise, were the "initiators" of the report to the public body in this regard. The Court concludes that Plaintiff has not sufficiently demonstrated a triable issue of material fact as to her alleged second instance of protected activity.

### c. Plaintiff's Third Alleged Incident of "Protected Activity."

■ As to Plaintiff's third asserted claim of protected activity, the Court finds no genuine issue of material fact. The facts involved in Plaintiff's third claim occurred subsequent to her termination. Plaintiff claims that, just after her termination, she made a written complaint to the State of Michigan. The complaint described the staffing shortages and the weight loss which she feared was caused by malnutrition. While this letter may be, as Plaintiff asserts, "completely consistent with the concerns [Plaintiff] ... raised immediately **before** [her] employment with the Defendants was terminated," Plaintiff has not shown by clear and convincing evidence that, prior to her termination, she was "about to report" the suspected violation of law to the State. *See* M.C.L. § § 15.363(4) ("An employee shall show by clear and convincing evidence that he or she or a person acting on his or her behalf was about to report, verbally or in writing, a violation or a suspected violation of a law of this state, a political subdivision of this

state, or the United States to a public body.").

Nor has Plaintiff shown that Defendants received notice of her intent to send the letter to the State. Plaintiff purports that she sent the letter to ensure that the State knew of the problems in the nursing home "just in case her physician referrals and MDS entries did not make it to the proper State agency." However, Plaintiff's attempt in this regard is not relevant to the issue of whether Defendants received notice of her *intent* to send the letter. This allegation cannot survive Defendants' Motion for Summary Judgment.

### 2. Legitimate Reason for the Adverse Action & Pretext

■ Defendants argue that Plaintiff was terminated because of a history of improper behavior. Defendants argue that Plaintiff was terminated "for saying something bad about the administrator." *See* Defs.' Br. at 1. Ms. Lundin, the Manager of Clinical Services, testified that during a conversation with Plaintiff, Plaintiff made derogatory comments about the Administrator, Leslie Shanlian. According to Defendants, Plaintiff stated that Ms. Shanlian "did not know what she was doing and that Shanilian was the reason that there was no dietician on staff." *Id.* Ms. Lundin allegedly reported these comments to Ms. Shanlian "because she felt disturbed and felt that the administrator needed to take over the situation." *Id.*

Shanlian confirmed with the Assistant Director of Nursing, Deborah Bridges, that Plaintiff made these comments. *Id.* According to Shanlian, she "had previously warned [Plaintiff] about this behavior," and just four months prior to the instant incident, Plaintiff had received a "Final Warning/Type B" for a different offense, to wit: failure "to support a nurse supervisor during an altercation with two employees." *Id.* Type B violations were con-

sidered "very serious" and would remain active. Further, Type B violations would be considered for progressive disciplinary purposes for two years. *Id.* If a final warning for a major/Type B has been received, it could result in termination. *Id.* (citing p. 37 attached as Ex. E of Employee Handbook).

The previous warning was signed by Plaintiff on October 25, 2000. *Id.* This warning specifically stated that Plaintiff would be subject to termination should her inappropriate behavior continue. *Id.* at 3 (citing Ex. F). Based on the remarks Plaintiff allegedly made about the Administrator in February 2001, Plaintiff received another "Employee Written Notice, Type B," this time for violating company rules 18 and 28. Rules 18 and 28 govern and employee's Unwillingness to Support Company Goals and Programs and Conducting Oneself Improperly in Other Situations Not Specifically Listed, respectively. *Id.* (citing Ex. D, Employee Warning Notice dated Feb. 15, 2001). Defendants claim that Plaintiff's history of improper behavior, and not her complaints about how alleged staffing shortages were causing patients to be underfed and leading to dietary deficiencies, resulted in Plaintiff's termination.

The Court determines that Defendants' allegations adequately state a legitimate, nondiscriminatory reason for terminating Plaintiff, namely insubordination and inappropriate behavior. *See, e.g., Sargent v. Int'l Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Food and Beverage Drivers, Warehousemen,* 713 F.Supp. 999, 1014 (E.D.Mich. 1989). To survive summary judgment, therefore, Plaintiff must produce sufficient evidence from which a reasonable juror could conclude that the proffered reasons for termination are pretext. *Booker v. Brown & Williamson Tobacco Co., Inc.,*

879 F.2d 1304, 1314 (6th Cir.1989) (affirming the grant of summary judgment for failure to produce evidence to rebut a legitimate, nondiscriminatory reason for an adverse employment decision).

As stated earlier, Plaintiff may meet her burden of showing pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *See Phinney,* 222 Mich. App. at 563, 564 N.W.2d at 558. Plaintiff has failed in both regards.

Plaintiff asserts that "Defendants' management had tremendous incentive to keep [her] and her bad news quiet." *See* Pl.'s Resp. Br. at 11. According to Plaintiff, Ms. Lundin and Ms. Shanlian were subject to termination because of Plaintiff's complaints. *Id.* Plaintiff further asserts that her complaints also affected the ability of Ms. Lundin and Ms. Shanlian to receive bonuses. *Id.* Citing to Ms. Shanlian's deposition testimony, Plaintiff argues that Ms. Shanlian's bonuses from the company were based upon the profitability of the facility and whether the facility was in good standing with the State of Michigan regarding care issues. *Id.* (citing Dep. of Leslie Shanlian at 29–30, Ex. 7).

Defendants respond by arguing that "management had no 'incentive' to keep Plaintiff quiet and their jobs were certainly not 'on the line' as Plaintiff implies." *See* Defs.' Reply Br. at 5. Defendants state that Ms. Shanlian had given notice that she would be leaving the nursing home to stay at home with her children "well *before* Plaintiff was terminated." *Id.* (citing Dep. of Leslie Shanlian at 6–7, Ex. E). Moreover, Ms. Shanlian admits that, because she was leaving, she was ineligible for a bonus. *Id.* (citing Dep. of Leslie Shanlian at 29, Ex. F). In accordance with her notice, Ms. Shanlian ended her employ

with Heartland shortly after Plaintiff was terminated.

As to Plaintiff's claim that Ms. Lundin was also in jeopardy of losing her job based on Ms. Deneau's complaints, Plaintiff cites no support for this proposition, and Defendants have not attempted to rebut this allegation. This Court is not required to accept as true unwarranted factual inferences. *Hoeberling,* 49 F.Supp.2d at 577. Plaintiff has failed to adequately support her factual allegation.

Finally, Plaintiff claims that Defendants allegedly violated their own handbook policies, but admits that she does not attempt to rebut Defendants' proffered reasons for Plaintiff's termination: "Since the Defendants argue that the Plaintiff was at-will and can be discharged for any reason or no reason, and they do not attempt to argue that they properly followed their discipline policies, the Plaintiff does not need to discuss whether the Defendants' reasons were pretextual." Pl.'s Resp. Br. at 19. Contrary to Plaintiff's assertion, Defendants assert that Plaintiff was terminated pursuant to the "performance improvement section which includes a progressive discipline policy." *See* Defs.' Br. at 2–3. Plaintiff's failure to rebut Defendants' legitimate reasons for termination is fatal to her action.

**B. Michigan Public Health Code, Part 217, M.C.L. § § 333.21771(1) & Wrongful Discharge in Violation of Defendants' Handbook Policies**

Plaintiff states in her Response Brief that she "does not seek recovery pursuant to the Public Health Code, Part 217, M.C.L. § § 333.21771(1) and (6). This Act clearly does not provide a former employee with specific remedies that the Plaintiff could better seek through her WPA and wrongful discharge (in violation of public

policy) claims." *See* Pl.'s Resp. Br. at 12. According to Plaintiff, the Complaint mentions the Public Health Code only "to place the Defendants on notice of the types of violations of public policy [Plaintiff] intends to present at trial." *Id.* Similarly, Plaintiff admits that Count IV of the Complaint merely relates to her WPA and public policy claims and is not intended as a separate cause of action. *Id.* at 18–19.

As to Count II, Plaintiff argues that, notwithstanding the fact that she does not seek recovery pursuant to the Public Health Code, the Court should not dismiss this Count. Instead, Plaintiff requests that this Court "simply instruct the jury as to the Plaintiff's WPA or wrongful discharge (in violation of public policy) claims only." *Id.* at 13. The Court declines to adopt Plaintiff's suggestion, and **DISMISS** Counts II and IV of Plaintiff's Complaint.

## C. Michigan Public Policy

Count III of Plaintiff's Complaint alleges wrongful discharge in violation of Michigan public policy. Defendants argue that Count III must be dismissed because the WPA is Plaintiff's exclusive remedy. *See* Defs.' Br. at 14. Plaintiff responds that her WPA and public policy arguments are listed in the alternative. *See* Pl.'s Resp. Br. at 14. In Plaintiff's estimation,

> If this Court finds that Deneau's public policy claim involves statutes that proscribe retaliatory discharge, then the Court should issue a ruling that allows the WPA claim to go forward and not the Wrongful Discharge (in Violation of Public Policy) claim. Conversely, if this Court finds that Deneau's public policy claim involves statutes that do not proscribe retaliatory discharge, then the Court should issue a ruling that allows the Wrongful Discharge (in Violation of

Public Policy) claim to go forward and not the WPA claim.

*Id.* at 14–15.

For support of her position, Plaintiff cites *Trombetta v. Detroit, T & I R.R. Co.,* 81 Mich.App. 489, 265 N.W.2d 385 (1978), *Baker v. Oakwood Hosp. Corp.,* 239 Mich. App. 461, 608 N.W.2d 823 (2000), *Watassek v. Mental Health Dept.,* 143 Mich.App. 556, 372 N.W.2d 617 (1985), and *Driver v. Hanley,* 226 Mich.App. 558, 566, 575 N.W.2d 31, 36 (1997). Defendants reply that a public policy claim is sustainable only where there is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue. *See* Defs.' Reply Br. at 2 (citing *Dudewicz v. Norris–Schmid, Inc.,* 443 Mich. 68, 80, 503 N.W.2d 645 (1993)).

Initially, the Court notes that Plaintiff's citation to *Watassek v. Mental Health Dept.,* 143 Mich.App. 556, 372 N.W.2d 617 (1985), for support of her position that, notwithstanding the WPA, she has an actionable claim of retaliatory discharge in violation of public policy is not well received. *Watassek* is inapposite; it merely stands for the proposition that a public policy against retaliatory discharge existed prior to enactment of the WPA. *See, e.g., Shuttleworth v. Riverside Osteopathic Hosp.,* 191 Mich.App. 25, 477 N.W.2d 453 (declining to follow Watassek ). Watassek speaks not at all to the issue of whether the WPA precludes a retaliatory discharge claim. Indeed, it could not speak to this issue, since the facts giving rise to the claims in Watassek occurred prior to the enactment of the WPA. *See* 143 Mich.App. at 564, 372 N.W.2d 617 ("Although this statute took effect in 1981, well after the action complained of in this case, we nevertheless find that the statute is evidence of a recognized public policy pre-existing its actual enactment.").

However, it is clear that the WPA represents Michigan's public policy against retaliatory discharge for reporting suspected violations of law to public bodies. *Dudewicz*, 443 Mich. at 79, 503 N.W.2d 645. In Michigan, the remedies provided by the WPA are exclusive, not cumulative. *Dudewicz*, 443 Mich. at 79, 503 N.W.2d 645; *see also Shuttleworth v. Riverside Osteopathic Hosp.*, 191 Mich. App. 25, 27, 477 N.W.2d 453 (1991). Therefore, any public policy claim of wrongful discharge arising out of the same facts is preempted by the WPA. *Dudewicz*, 443 Mich. at 70, 78, 503 N.W.2d 645; *see also Dolan v. Continental Airlines/Continental Express*, 454 Mich. 373, 381–83, 563 N.W.2d 23 (1997).

In *Driver v. Hanley*, the Michigan Court of Appeals clarified the holding in *Dudewicz* by noting that a public policy claim is sustainable "only where there is not an *applicable* statutory prohibition against discharge in retaliation for the conduct at issue." 226 Mich.App. at 566, 575 N.W.2d at 36 (emphasis in original); *see also Garavaglia v. Centra, Inc.*, 211 Mich.App. 625, 630, 536 N.W.2d 805 (1995). *Driver* further noted that when the WPA provides no remedy at all, it cannot provide a plaintiff's "exclusive remedy." 226 Mich.App. at 566, 575 N.W.2d at 36. Accordingly,

a *sine qua non* of any preclusion by the WPA would be the applicability of the express remedy of the WPA. *Dudewicz v. Norris–Schmid, Inc.*, 443 Mich. 68, 80, 503 N.W.2d 645 (1993). Further, in order for the express remedy of the WPA to apply, a whistleblower's "report, or attempted report, must be made to a 'public body.'" *Id.* at 74, n. 3, 503 N.W.2d 645.

*Ciccarelli v. Plastic Surgery Affiliates, P.C.*, 2001 WL 699094, at \*2 (Mich.Ct.App. March 27, 2001). Although *Ciccarelli* is an

unpublished opinion, the Court should find its logic persuasive.

Defendants argue that "Plaintiff's allegations against Defendants clearly involve claims of retaliation for Plaintiff's reporting to the State her 'concerns' over patient weight loss and staffing shortages." *See* Defs.' Reply Br. at 2. Defendants further argue that both the WPA and the public policy claims must be dismissed because "Plaintiff has failed to present a genuine issue of material fact that she was dismissed for reporting to the State alleged patient malnutrition under both theories, and, in fact, admits that she was never told not to report such information to the State." *Id.* at 3. Defendants are not entirely correct.

In *Trombetta v. Detroit, Toledo & Ironton R. Co., et al.*, 81 Mich.App. 489, 265 N.W.2d 385 (1978), the plaintiff, a former at-will employee of defendants, commenced an action alleging that defendants had wrongfully discharged him from their employ. The plaintiff argued that said termination violated Michigan public policy in that he was terminated after refusing to alter pollution control reports, which were filed with the state "to insure that defendant company was in conformity with the state pollution control standards." *Id.* at 491, 265 N.W.2d 385. Plaintiff contends that, because "the pollution control laws themselves did not proscribe retaliatory discharge of a reporting employee," the plaintiff in *Trombetta* was allowed to proceed with a claim of discharge in violation of Michigan public policy. *See* Pl.'s Resp. Br. at 15.

As it relates to Count III of Plaintiff's Complaint, the Court notes that *Trombetta* is not entirely on point.[2] Nowhere in *Trombetta* does the court state that its

---

2. *Trombetta,* however, fully supports Plaintiff's claim that she has a cause of action for

termination in violation of public policy not withstanding her at-will employee status.

decision to allow the plaintiff to proceed under a public policy theory was based on the fact that the governing laws did not prohibit retaliatory discharge. Rather, the court's decision appears to have been based on an exception to the at-will employment laws of Michigan: "This Court has recognized exceptions to the well established rule that at will employment contracts are terminable at any time for any reason by either party." *Id.* at 495, 265 N.W.2d 385. Notwithstanding this distinction between *Trombetta* and allegations set forth in Count III, the Court acknowledges, as did the court in *Trombetta*, that "the public policy of [Michigan] does not condone attempts to violate its duly enacted laws." *See id.*

The Court in *Trombetta* cited directly to the pollution control laws for support of its conclusion that defendants' alleged actions would violate the law of Michigan. *Id.* at 495–96, 265 N.W.2d 385. Here, Plaintiff argues that "[s]he should be allowed to continue with her wrongful discharge (in violation of public policy) claim because she reported patient malnutrition under State nursing home laws," and cites M.C.L. § § 333.21771 as the nursing home law allegedly violated.

MCL § 333.21771(1) states, in pertinent part, that "[a] licensee, nursing home administrator, employee of a nursing home shall not physically, mentally, or emotionally abuse, mistreat, or harmfully neglect a patient." Section 333.21772 continues:

(2) *A nursing home employee who becomes aware of an act prohibited by this section immediately shall report the matter to the nursing home administrator or nursing director.* A nursing home administrator or nursing director who becomes aware of an act prohibited by this section immediately shall report the matter by telephone to the department of public health, which in turn

shall notify the department of social services.

\* \* \* \* \* \*

(6) *A licensee or nursing home administrator shall not evict, harass, dismiss, or retaliate against a patient, a patient's representative, or an employee who makes a report under this section.* MCL §§ 333.21772(2) and (6) (emphases added).

Plaintiff claims that she was terminated for reporting her concerns regarding the dietary well-being of certain Heartland residents and for complaining about Heartland's alleged staffing problems. Defendants allegedly instructed Plaintiff not to complete physician referrals based on these concerns. Plaintiff did anyway, and was terminated shortly thereafter. The Court finds that Plaintiff's allegations present an adequate claim upon which relief can be granted for termination in violation of public policy. For the reasons stated in Section III(A)(1), *supra*, the Court further finds that Plaintiff has presented sufficient evidence showing a triable issue of material fact capable of surviving Defendants' Motion for Summary Judgment.

Plaintiff's citation to *Baker v. Oakwood Hosp. Corp.*, 239 Mich.App. 461, 608 N.W.2d 823 (2000), also supports Plaintiff's position that a public policy claim may still be made should her WPA claim be dismissed. In *Baker*, the court noted that the plaintiff's claim was viable as a public policy claim, as opposed to a WPA claim, because "[t]he Whistleblowers' Protection Act, ... protects from retaliation employees who reported or were about to report their employers' illegal conduct to a government agency. Plaintiff has never alleged that she was prepared to report [Defendant's] conduct to the FDA or any other government agency, and has never sought relief under the Whistleblowers'

statute." In the case at bar, Plaintiff *does* assert a WPA claim. However, should the Court determine that the WPA claim cannot survive summary judgment, a public policy claim may nonetheless remain viable.

 Notwithstanding the possibility that a public policy claim may remain viable should the Court dismiss the WPA claim, the Court dismisses Count III in its entirety. As stated earlier, Plaintiff has failed to adequately rebut Defendants' proffered reason for termination. Based on the analysis in the Section III(A)(1)(b). This Court **DISMISSES** Count III.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is **GRANTED,** and Plaintiff's Complaint is **DISMISSED** in its entirety.